1    **WO**

2

3

4

5

6                              **FOR PUBLICATION**

7                    IN THE UNITED STATES DISTRICT COURT

8                        FOR THE DISTRICT OF ARIZONA

9

10   United States of America,              )   CR-05-498-PCT-FJM
                                            )
11            Plaintiff,                     )   **OPINION**
                                            )
12   vs.                                     )
                                            )
13                                           )
     Juvenile Male 1                         )
14                                           )
              Defendant.                     )
15                                           )
                                            )
16   _____)

17   MARTONE, District Judge:

18            This is a delinquency proceeding under 18 U.S.C. §§ 5031-42 in which the

19   juvenile is charged with violating 18 U.S.C. §§ 1153 and 2241(c), aggravated sexual abuse

20   of a minor on an Indian reservation.   The issue is whether the juvenile's right "to have

21   compulsory process for obtaining witnesses in his favor" under the Sixth Amendment to the

22   United States Constitution extends to those witnesses who are the custodians of records

23   maintained by school and social service agencies under the control of the Navajo Tribe of

24   Indians.  We hold that it does.

25                                            I

26            The juvenile in this case contends that the victim is falsely accusing him and that

27   the victim's records at the Navajo Nation Shiprock Youth Home and the Navajo Social

28

1  Services will contain evidence to support this contention. We granted the juvenile's
2  applications for subpoenas *duces tecum* under Rule 17(b) and (c), Fed. R. Crim. P.

3       Instead of compliance, or a motion to quash or modify under Rule 17(c)(2), Fed.
4  R. Crim. P., Kandis Martine, a lawyer employed by the Navajo Tribe, sent a letter to the
5  Office of the Federal Public Defender stating that it would not honor the subpoena issued to
6  the Navajo Social Services unless the Federal Public Defender followed what she
7  characterized as a "routine procedure for domestication of extra-territorial subpoenas through
8  the Navajo Nation courts." Motion to Compel, Exhibit A at 1 (doc. 53). The juvenile then
9  filed a motion to compel compliance with the subpoena *duces tecum* and outlined the efforts
10 that even the United States Attorney and the FBI undertook in order to get the Tribe to
11 comply with the subpoena. The Tribe was just as uncooperative with the government. The
12 juvenile argued that the Tribe was interfering with his Sixth Amendment rights in this federal
13 prosecution and that even if the Tribe had some governmental immunity to ignore federal
14 process, it surely waived it by providing documents to the government. The government did
15 not oppose the motion to compel and we promptly entered an order dated March 17, 2006
16 which, as to the objections raised in the Kandis Martine letter, stated as follows:

17      The objections raised in the letter are without merit. There are no
issues of 'domestication of extra-territorial subpoenas through the
18      Navajo Nation Courts.' The Navajo reservation is within the
jurisdiction of the United States and process issued by this court is
19      obviously independently effective.

20 Order of March 17, 2006 at 1 (doc. 55).

21      The juvenile fared no better with the subpoena served on the Shiprock Youth
22 Home. Diandra D. Benally, a lawyer employed by the Navajo Tribe, sent the Federal Public
23 Defender a letter dated March 27, 2006 stating that the subpoena would be ignored
24 "[b]ecause the Navajo Nation is a separate sovereign nation, and as a matter of public policy,
25 foreign subpoenas issued from neighboring sovereigns are not honored." Motion to Compel,
26 Exhibit A at 1 (doc. 58). Thus, the juvenile filed a second motion to compel compliance
27 with subpoena *duces tecum* contending again that his rights under the Sixth Amendment were
28 in jeopardy and, in any event, there was waiver. The juvenile again described how the Tribe

rejected even the overtures of the government and its FBI agent. The government, of course, did not oppose the motion to compel. In granting it we said:

> The reasons stated in Diandra Benally's letter of March 27, 2006 for not complying with the subpoena are utterly without merit. The reference to a federal subpoena as a 'foreign' subpoena and the suggestion for 'domestication of extra-territorial' subpoenas reflect an erroneous understanding of the relationship between the United States and Indian tribes. While Indian tribes have been accorded a certain amount of self-governmental power over their own members, and while they have been insulated generally from the application of state law, Congress has plenary control over Indian affairs and has exercised that plenary power by the enactment of the Major Crimes Act. The Navajo reservation is within the jurisdiction of the United States of America and a federal subpoena is as fully and independently operative within the reservation as without. Indeed, no state of the union or municipality of a state would dream of thinking that because a state is a sovereign, a federal subpoena must be domesticated in its court. Under the Constitution of the United States, the federal Constitution and laws are the supreme law of the land. U.S. Const. art. VI.

Order of April 4, 2006 at 1-2 (doc. 59).

We then granted the juvenile's request for an order to show cause to the custodians of records of the Shiprock Youth Home and Navajo Social Services, along with Kandis Martine and Diandra Benally of the Office of the Navajo Attorney General and scheduled a contempt proceeding for May 12, 2006. Order of April 5, 2006 (doc. 66).

The court then received four separate motions to quash the order to show cause filed by Dana Bobroff, a lawyer employed by the Navajo Tribe on behalf of Kandis Martine, Diandra Benally, social worker Jennifer Johnson of Navajo Social Services, and the custodian of records of the Navajo Nation Shiprock Youth Home. Among other arguments, the Tribe contended that the subpoenas were "contrary to the Navajo Nation's sovereign immunity" and not "from a Court of competent jurisdiction." Memorandum in Support of Motion to Quash (re Jennifer Johnson) at 3 (doc. 76). The Tribe argued that "[t]he Navajo Nation's status as a sovereign nation should be recognized rather than resorting to a foreign court." *Id.* at 9-10. In addition, the Tribe raised, for the first time, the case of *United States v. James*, 980 F.2d 1314 (9th Cir. 1992).

1    The juvenile filed a consolidated Response to the Tribe's motions to quash (doc.
2  77), and noted that under settled doctrines of federal Indian law, the Tribe's contention that
3  a federal subpoena was a "foreign" subpoena that needed to be "domesticated" in a tribal
4  court was without support under federal law. The juvenile also argued that *James* did not
5  control the outcome here because it did not address the defendant's constitutional rights,
6  including his Sixth Amendment rights to confrontation and compulsory process. Indeed, the
7  juvenile argued that if a claim of immunity were upheld here, then the proceeding against
8  him would have to be dismissed because it would be in violation of the Constitution.
9  Defendant's Response at 7 (doc. 77).

10    On the day before the hearing, the juvenile moved to continue because he
11  received a letter dated May 10, 2006 from Lee Stein on behalf of the Navajo Tribe indicating
12  that the Tribe was now willing to voluntarily produce some records. Defendant's Motion to
13  Continue, Exhibit A (doc. 78). Nevertheless, because Mr. Stein's letter asserted that the "two
14  subpoenas that have been issued are not valid" based upon the Tribe's immunity, the court
15  denied the juvenile's motion to continue so that we could put this issue to rest. Order of May
16  11, 2006 (doc. 79).

17    At the hearing on May 12, 2006, Ms. Benally, Ms. Martine, Ms. Lee, and Ms.
18  Johnson appeared on their own behalf. Mr. Stein appeared on behalf of the Navajo Tribe.
19  We shared our opinions with counsel, denied all motions to quash, and ordered the served
20  parties to produce the subpoenaed documents by the date Mr. Stein said they would be ready,
21  May 19, 2006. Although Mr. Stein put distance between himself and the political rhetoric
22  contained in the letters and memoranda cited above, he would not concede that tribal
23  employees had a legal obligation to comply with federal subpoenas.

24                                                II

25    We first dispatch political rhetoric and then get to the heart of the matter. The
26  United States of America is a country. Its sovereignty extends to its full geographical limits.
27  And, under Article VI of the United States Constitution, its Constitution and laws "shall be
28  the supreme Law of the Land." An Indian tribe is not a legal unit of international law.

- 4 -

1    *Cayuga Indian Claims (Great Britain v. United States),* 20 Am. J. Int'l. L. 574 (1926). An

2    Indian tribe is not a foreign state under the Constitution. *Cherokee Nation v. Georgia,* 30

3    U.S. (5 Pet.) 1, 20 (1831). And, 25 U.S.C. § 71 (originally enacted as Act of March 3, 1871,

4    ch. 120, 16 Stat. 544, 566), provides that "[n]o Indian nation or tribe within the territory of

5    the United States shall be acknowledged or recognized as an independent nation, tribe, or

6    power."

7        It was thus frivolous for the lawyers representing the Tribe to refer to a federal

8    subpoena as "extra-territorial," to describe the Tribe as a "separate sovereign nation," to refer

9    to this court's processes as "foreign subpoenas issued from neighboring sovereigns," and to

10   refer to this court as "foreign." If this rhetoric had come from non-lawyers, one could just

11   dismiss it as hyperbole. But lawyers have an obligation to refrain from making frivolous

12   contentions. *See, e.g.,* ER 3.1, Arizona Rules of Professional Conduct, which applies to

13   lawyers authorized to practice before the United States District Court for the District of

14   Arizona. LRCiv 83.2(d). This includes tribal lawyers. LRCiv 83.1(b)(2).

15        To be sure, federal law permits Indian tribes a limited power of self-government

16   over their own members. *United States v. Wheeler,* 435 U.S. 313, 323, 98 S. Ct. 1079, 1085-

17   86 (1978); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S. Ct. 1011 (1978). And,

18   federal law has generally insulated tribal members from the application of state law while on

19   their reservation. *E.g., McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S. Ct.

20   1257 (1973). But the Congress of the United States and the Supreme Court of the United

21   States have always made it quite clear that these limited doctrines under federal Indian law

22   have no application when it comes to relationships between Indian tribes and the United

23   States. Here, Congress has vested jurisdiction over major crimes committed by Indians on

24   a reservation in this court. 18 U.S.C. § 1153. In rejecting a challenge to the constitutionality

25   of the statute, the Supreme Court of the United States said:

26
27
28
> Indians are within the geographical limits of the United States. The
> soil and the people within these limits are under the political control
> of the government of the United States, or of the states of the Union.
> There exist within the broad domain of sovereignty but these two.

- 5 -

1 *United States v. Kagama*, 118 U.S. 375, 379, 6 S. Ct. 1109, 1111 (1886).

2 The power of Congress in the area of Indian affairs under Article I, § 8 of the
3 United States Constitution is plenary. *E.g., South Dakota v. Yankton Sioux Tribe*, 522 U.S.
4 329, 343, 118 S. Ct. 789, 798 (1998). Congress can even repeal a treaty by unilateral action.
5 *The Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 621 (1870).

6 It is thus plain that the reasons given by the tribal lawyers to the juvenile for non-
7 compliance with the subpoenas were frivolous. The Tribe's reliance upon *United States v.*
8 *James*, 980 F.2d 1314 (9th Cir. 1992), made for the first time in support of its motions to
9 quash filed in this court, is more colorable, and it is to that issue that we next turn.

10 III

11 The Tribe argues that its sovereign immunity precludes the enforcement of the
12 subpoenas against employees of tribal entities. The centerpiece of its argument is *James*.
13 The juvenile contends that *James* does not control here because it did not address the
14 juvenile's constitutional rights and those rights, of course, "trump any claim of immunity the
15 tribe may assert." Defendant's Response at 7 (doc. 77).

16 The doctrine of sovereign immunity protects a tribe as an entity from lawsuits
17 without congressional consent. In *United States v. U.S. Fid. & Guar. Co.,* 309 U.S. 506, 512,
18 60 S. Ct. 653, 656 (1940), the Court stated that "[t]hese Indian nations are exempt from suit
19 without Congressional authorization. It is as though the immunity which was theirs as
20 sovereigns passed to the United States for their benefit, as their tribal properties did."

21 This immunity protects a tribe as an entity from unconsensual civil actions against
22 it. The service of a federal subpoena on an employee of an entity of a tribe is neither a suit,
23 nor one against a tribe. For example, the United States enjoys sovereign immunity from suit
24 without its consent. And the states of the Union enjoy immunity from suit without their
25 consent. But it can hardly be contended that federal or state sovereign immunity from suit
26 has any application to the enforcement of a federal subpoena on the custodian of records of
27 a state or federal agency. Federal subpoenas routinely issue to state and federal employees
28 to produce official records or appear and testify in court and are fully enforceable despite any

1  claim of immunity. *See, e.g., Exxon Shipping Co. v. United States Dep't of Interior*, 34 F.3d

2  774, 778 (9th Cir. 1994). Even the President of the United States must comply with a federal

3  subpoena. *United States v. Nixon*, 418 U.S. 683, 713, 94 S. Ct. 3090, 3110 (1974). It would

4  be strange indeed if a federal subpoena were operative against the greater sovereign and its

5  officers but not the lesser. *See Cherokee Nation v. Southern Kan. Ry. Co.*, 135 U.S. 641,

6  656, 10 S. Ct. 965, 971 (1890).

7  But even if the immunity of a tribe as an entity from lawsuits has any application

8  to the enforcement of a subpoena against an employee of a tribal entity, tribal immunity has

9  no application to claims made by the United States. As the court stated in *Quileute Indian*

10  *Tribe v. Babbitt*, 18 F.3d 1456, 1459 (9th Cir. 1994), "tribal sovereignty does not extend to

11  prevent the federal government from exercising its superior sovereign powers."

12  Moreover, Congress has vested jurisdiction over major crimes committed by

13  Indians on the reservation in the federal courts. Everything that Congress does is in turn

14  subject to the limitations imposed on it by the Constitution of the United States. The Sixth

15  Amendment to the Constitution provides in relevant part that "[i]n *all* criminal prosecutions,

16  the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and]

17  to have compulsory process for obtaining witnesses in his favor." (Emphasis added).[1]

18  Congress could not except out from the Sixth Amendment federal prosecutions for crimes

19  on Indian reservations. Thus, it is plain that when Congress vested jurisdiction in the federal

20  courts, it expected it to be effective. The juvenile here has the right to compulsory process

21  or else this prosecution shall fail. The District of Arizona has hundreds of such cases every

---

25  [1]  "The very integrity of the judicial system and public confidence in the system
26  depend on full disclosure of all the facts, within the framework of the rules of evidence. To
27  ensure that justice is done, it is imperative to the function of courts that compulsory process
be available for the production of evidence needed either by the prosecution or by the
28  defense." *Nixon*, 418 U.S. at 709, 94 S. Ct. at 3108.

1   year.[2]  We could not process all of these cases if a tribe's immunity from civil actions

2   interfered with the defendant's right to compulsory process.  The Congress did not address

3   this question because it would not have occurred to anyone that a tribe's immunity from civil

4   actions had anything at all to do with the obligation of a witness to produce documents and

5   to testify.  So, for example, in *In re Long Visitor*, 523 F.2d 443 (8th Cir. 1975),  members

6   of a tribe refused to give testimony before a grand jury pursuant to grand jury subpoenas.

7   The tribal members tried to rely upon the tribe's sovereign immunity as a defense to the

8   enforcement of the subpoenas.  The court rejected this and stated that "the extension by

9   Congress of federal jurisdiction to crimes committed on Indian reservations inherently

10   includes every aspect of federal criminal procedure applicable to the prosecution of such

11   crimes."  *Id.* at 446.  The court went on to hold that "[a]n Indian reservation provides no

12   sanctuary from the reach of a federal subpoena to compel testimony before a grand jury on

13   matters within the jurisdiction of the District Court." *Id.* at 447.

14         The Tribe does not address any of this but merely rests its case on *United States*

15   *v. James*, 980 F.2d 1314 (9th Cir. 1992). James, convicted of rape, contended that the district

16   court had erred in quashing a subpoena to the director of social services of the Quinault Tribe

17   based on tribal immunity.  The court rejected his argument and stated that "[b]y making

18   individual Indians subject to federal prosecution for certain crimes, Congress did not address

19   implicitly, much less explicitly, the amenability of the tribes to the processes of the court in

20   which the prosecution is commenced." *James*, 980 F.2d at 1319.  At one point the court

21   characterized the subpoena as "to the Quinault Indian Nation" but in the next sentence stated

22   that the subpoena was "directed toward Richard Marinez, Director of Social Services of the

23   Quinault Indian Nation." *Id.*  It is thus not clear whether the subpoena was directed to the

24   tribe as an entity or to an individual witness.  Although the court acknowledged that tribal

25   immunity does not extend to individual members, *id.*, it did not discuss how tribal immunity

26

27      [2]  In 2004, there were 253 criminal case referrals from the Navajo reservation alone
to the United States Attorney for the District of Arizona, including 31 homicides.  Office of

28   the United States Attorney, *2004 Indian Country Report* at 66 (2004).

1    from suit extended to a case in which the tribe was not a party and no suit was filed against
2    it. In contrast to the case before us, no constitutional issues were raised. There is thus no
3    discussion of how the defendant's constitutional right to compulsory process could be
4    reconciled with the unenforceability of a federal subpoena against a witness.

5            The limited nature of the *James* discussion was noted in *United States v.*
6    *Snowden,* 879 F. Supp. 1054, 1057 (D. Or. 1995). There, the court denied a tribe's motion
7    to quash a subpoena for a victim's counseling records because the defendant's "constitutional
8    rights of due process, fair trial, confrontation, and compulsory process outweigh the [tribe's]
9    claim of immunity." *Id.* The court stated that "*James* does not control because the defendant
10   did not raise constitutional challenges to the claim of immunity." *Id.*

11           Nor did *James* acknowledge or address the extensive treatment of this issue in *In*
12   *re Long Visitor,* 523 F.2d 443 (8th Cir. 1975). This was noted in *United States v. Velarde,*
13   40 F. Supp. 2d 1314, 1315-16 (D.N.M. 1999). There, the Jicarilla Apache Tribe relied
14   heavily on *James* to resist subpoenas issued in a federal prosecution under the Major Crimes
15   Act. The court disagreed with *James* because it did not take into account the constitutional
16   issues at stake. *Velarde,* 40 F. Supp. 2d at 1317. The court followed the rule of *In re Long*
17   *Visitor* that the extension of federal jurisdiction included every aspect of criminal procedure
18   applicable to the prosecution of crimes. *Id.* at 1316.

19           To be sure, the District of New Mexico is in the Tenth Circuit and, unlike this
20   court, is free to explicitly disagree with *James.* But the Navajo reservation lies in Arizona,
21   Utah, and New Mexico. Only that portion of it in Arizona lies within the Ninth Circuit. If
22   *James* is as broad a rule as advanced by the Tribe here, we would have the anomalous
23   situation in which federal criminal prosecutions on the Navajo reservation would be
24   profoundly different depending upon whether the offense occurred within the District of New
25   Mexico, the District of Utah or the District of Arizona. If this direct conflict were allowed
26   to exist, "important federal interests in the prosecution of major offenses on Indian
27   reservations would be frustrated." *United States v. Wheeler,* 435 U.S. 313, 331, 98 S. Ct.
28   1079, 1090 (1978).

                                                - 9 -

1   Were we free to do so, we too would reject *James*.   But we are not.
2   Nevertheless, we agree with the juvenile here, and the court in *Snowden*, that *James* does not
3   control because the defendant there did not raise constitutional challenges to the claim of
4   immunity. The mischief caused by an extension of immunity beyond its purpose was neither
5   presented to nor considered by the court in *James*. Indeed, we believe that if given an
6   opportunity there is every likelihood that the United States Court of Appeals for the Ninth
7   Circuit would revisit the issue. If not, a very plain circuit split would exist. And this would
8   be no ordinary circuit split. Indians prosecuted for federal offenses on that part of the Navajo
9   reservation in the District of New Mexico (and very likely the District of Utah), would have
10  the right to compulsory process under the Constitution, and those Indians prosecuted for
11  federal offenses on that part of the Navajo reservation in the District of Arizona would not.
12  This would very likely raise a certworthy issue.

13          It is the case, of course, that the Tribe has agreed to produce some of the records
14  here. But federal criminal prosecutions cannot depend upon the vagaries of the Tribe's
15  decisions to produce records. Compliance with a federal subpoena is not a consensual act.
16  The United States District Court for the District of Arizona is overwhelmed with criminal
17  offenses arising under the Major Crimes Act on the Navajo reservation. All of this would
18  come to a halt if tribal officials and employees believed that compliance with federal process
19  was optional. The Tribe's position is so broad here that it would extend even to tribal police
20  reports on the very offenses charged. No rational system of criminal justice, and certainly
21  no constitutional one, could operate under such a regime.

22                                              IV

23          For all these reasons, it is ordered denying the Tribe's motions to quash.
24          DATED this 24th day of May, 2006.

25

26          *Frederick J. Martone*

27                              Frederick J. Martone
                                United States District Judge

28

                                        - 10 -